# IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

\* \* \*

**FILED**

DISTRICT COURT OF GUAM

JUL 20 2007

MARY L.M. MORAN
CLERK OF COURT

UNITED STATES OF AMERICA,    )
                             )
                 Plaintiff,  )
                             )
     vs.                     ) MAGISTRATE CASE
                             )     NO. 07-00013
LOUIS J. PEARLMAN,           )
                             )
                 Defendant.  )
_____)

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE FRANCES M. TYDINGCO-GATEWOOD

Chief Judge

**REMOVAL HEARING**

**MONDAY, JUNE 18, 2007**

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFF:

4    UNITED STATES ATTORNEY'S OFFICE
     BY:  MARIVIC DAVID, Esq.
5    ASSISTANT UNITED STATES ATTORNEY
     Suite 500, Sirena Plaza
6    108 Hernan Cortez Avenue
     Hagatna, Guam  96910
7

8    Also present:

9    William Kline, FBI Agent

10   David Smith, Legal Attache/Indonesia

11

12   FOR THE DEFENDANT:

13   OFFICE OF THE FEDERAL PUBLIC DEFENDER
     BY:  RICHARD P. ARENS, ESQ.
14   First Hawaiian Bank Building
     Mongmong, Guam
15

16   Also present:

17   Alexander Modaber, Esq.
     Investigator for Federal Public Defender
18

19

20

21

22

23

24

25
```

1         HAGATNA, GUAM; MONDAY, JUNE 18, 2007; 2:30 P.M.

2                            * * *

3         THE CLERK: Magistrate Case 07-00013, United

4   States of America versus Louis J. Pearlman, continued

5   initial appearance Re Petition for Writ of Removal.

6         Counsel, please state your appearances.

7         MS. DAVID: Good afternoon, Your Honor.

8   Marivic David for the United States and Special Agent

9   William Klein with the FBI.

10        THE COURT: Good afternoon, Mr. Kline,

11  Ms. David.

12        MR. ARENS: Good afternoon, Your Honor.

13  Richard Arens, Assistant Federal Defender, present with

14  Mr. Pearlman, prepared to go forward.

15        I would like to bring one --

16        THE COURT: Can you speak into the mic? You

17  know what, we have a problem with the mic here. Put

18  that up. Go ahead, Mr. Arens.

19        MR. ARENS: Just one technical issue. I've

20  already pointed it out to the court clerk as well as

21  government counsel, and that is, on Page 2, I believe,

22  of my memorandum there is a typo. I've cited to the

23  case of *United States v. Gravatt*; however, I indicated

24  although the citation is correct, I indicated that it

25  was the Ninth Circuit extending *Simmons*, and in fact

1 | it's the Third.

2 | THE COURT: Very well, yeah, I do -- I have

3 | received that correction, that's fine.

4 | Okay. Well, first of all, thank you for being

5 | understanding of delaying this hearing for 30 minutes.

6 | I did have like four sentencings scheduled this

7 | morning, and I was running a little behind in another

8 | initial appearance, and then I had a family funeral, so

9 | I appreciate you all being -- allowing this court to

10 | have this hearing 30 minutes later.

11 | The court is in receipt of the June 18th

12 | memorandums from both Ms. David, U. S. Attorney, and

13 | also from Mr. Arens, Federal Public Defender. I'll

14 | start with the position of the government first. We'll

15 | discuss this issue of appointment of counsel, whether

16 | or not this defendant deserves appointment of a free

17 | counsel.

18 | Ms. David, you may proceed.

19 | MS. DAVID: Your Honor, it's the government's

20 | position, as reflected in its --

21 | THE COURT: Will you come to the podium?

22 | MS. DAVID: Yes, Your Honor.

23 | THE COURT: I think that's the only way we're

24 | going to hear correctly here, me and Ms. Miles.

25 | Go ahead.

1          MS. DAVID:   Good afternoon, Your Honor.

2          THE COURT:   Good afternoon.

3          MS. DAVID:   It's the government's position, as

4   reflected in its papers filed this morning, that the

5   court's comment in last week's hearing is well taken.

6   Certainly, every defendant who appears before this

7   court, if he or she is able to satisfy to the court's

8   satisfaction that he or she is unable to afford counsel

9   to represent himself or herself, then under the

10  Criminal Justice Act, upon appropriate inquiry by the

11  court, whether it's the defendant's having to complete

12  a financial affidavit form or furnish other financial

13  information that the court deems adequate in the case,

14  it's basically the defendant's burden.  If the

15  defendant seeks court-appointed counsel at government

16  expense, the court and certainly the public has the

17  right to make sure that the defendant satisfies his

18  burden.

19         THE COURT:   Okay.  And what if he claims the

20  Fifth Amendment?

21         MS. DAVID:   Your Honor, first of all, the

22  court must make the finding that that claim of a Fifth

23  Amendment privilege is not speculative, is real.   And

24  if the court should make that finding, in other

25  district courts, whether it's in the Ninth Circuit or

Wanda M. Miles
Official Court Reporter
Case 1:07-mj-00013    Document 13    Filed 07/20/2007    Page 5 of 58

1    other circuit courts, it's basically left to the
2    court's discretion whether the court wants to conduct
3    an *in camera* review, whether the court wants to allow
4    the government access to the information the defendant
5    so provides.

6    Ultimately, the government's position is, in
7    the case of this defendant, our concern is that he not
8    manipulate the system and he satisfies to the court's
9    satisfaction, indeed, he is unable to afford counsel at
10   this stage of the proceedings.

11   THE COURT: So as I understand reading the law
12   there's two processes, either he comes back into my
13   chamber and we seal the courtroom and he speaks under
14   oath in a sealed proceeding where the information that
15   he provides to me regarding his financial status cannot
16   be used by your office, or the United States Attorney's
17   Office in Florida at this time for purpose of
18   prosecution. Is that your understanding?

19   Or the second route, and just maybe we can
20   get some clarification on this, is that there be
21   provided a use immunity to him, and so -- is that your
22   understanding about the law?

23   MS. DAVID: Your Honor, as I understand from
24   my reading of the cases, and certainly, from looking at
25   the standard financial affidavit form that every

defendant is supposed to complete, there's always a
notice that the information that defendant provides to
the court after swearing in that everything is true, he
signs it under penalty of perjury. So there's always
that instance where the government may seek, if there
is indeed a case, a future prosecution for perjury or
false statement.

THE COURT: That's assuming that he fills out
the form, and as of today the defendant has pretty much
asserted his Fifth Amendment privilege against self-
incrimination on most of the questions.

MS. DAVID: But then the court has the
authority to still seek financial information from the
defendant, because --

THE COURT: Right, and how does the court do
that? Is the law such that I have to receive his
financial data in a sealed *in camera* proceeding? And
according to law, it should not be made available for
purposes of tax prosecution, or, he may be granted use
immunity.

MS. DAVID: That's correct, Your Honor, I was
more concerned about the potential prosecution as well
for perjury, and indeed, the use immunity. The bottom
line, Your Honor, is this court must be satisfied
whether or not this defendant indeed does not have the

1   financial resources.

2           THE COURT: Right, okay. So do you, so you

3   agree then that if we were to proceed, if the defendant

4   still wishes to have counsel at federal government

5   expense, that the court should conduct an *in camera*

6   review with him, and seal the proceedings, per the law?

7   Because I'm not sure, you know what I mean, I'm not

8   sure, you know, this issue has never really been

9   brought before me, and that's why I asked you all to

10  brief this. The issue of defendant being prosecuted

11  for giving me false information, let's assume -- and

12  I'm not saying that he will -- but, if he were to do

13  that under oath, because he would have to go under

14  oath, I would have Ms. Miles, my court reporter, with

15  me in an *in camera* proceeding, and it would be sealed,

16  and if he were -- if it was, I'm not sure if you would

17  have access or the United States Attorney's Office

18  could have access at a later time for purpose of

19  ascertaining whether or not the defendant has perjured

20  himself even in that proceeding. I think it's possible

21  that they could, but I'm not absolutely sure.

22          MS. DAVID: Actually, Your Honor, and this was

23  just from an unpublished --

24          THE COURT: Opinion?

25          MS. DAVID:   -- decision.

1    THE COURT: Are we supposed to cite to those?

2    MS. DAVID: And I haven't --

3    THE COURT: Are you supposed to tell me about

4    them?

5    MS. DAVID: Well, Your Honor.

6    THE COURT: Are you going to get in trouble by

7    the Ninth Circuit if you are?

8    MS. DAVID: All I'm saying is there are

9    unpublished reported decisions, but the bottom line is,

10   it's up to the court's discretion.

11   THE COURT: What's up to the court's

12   discretion?

13   MS. DAVID: If the time should occur at some

14   later date that there is an interest in the government

15   seeking to unseal the financial information the

16   defendant provided to the court, then at that date, if

17   it even occurs, the appropriate motion will be filed.

18   But for purposes of this removal hearing, Your Honor,

19   I'm not aware of such an interest being asserted at

20   this time.

21   THE COURT: Well, okay. But I mean, at a

22   later time I suppose a defendant should have -- be

23   given some notice that if he were to come into an

24   *in camera* proceeding under seal with my court reporter,

25   and he's under oath, that there's a possibility that

1    the United States Government, either the Florida United
2    States Attorney the Guam United States Attorney wishes
3    to obtain that information, I guess he should have
4    certain notice that that's a possibility.
5              MS. DAVID:  That's correct, Your Honor.
6              THE COURT:  Okay.  Do you have any objection
7    according -- Well, I'll hear from Mr. Arens shortly,
8    but do you have any objections for this court
9    conducting *in camera* review of the defendant's
10   financial status?
11             MS. DAVID:  Well, perhaps, if the defendant is
12   able to put on the record to the court's satisfaction
13   why in his case, for the present charge in the
14   complaint in Orlando, that is sufficient.
15             THE COURT:  Okay.  So you have no objection to
16   the actual proceeding.  How I come about with my
17   decision following the hearing is another matter, but
18   in terms of the actual procedure right now.
19             MS. DAVID:  That's correct, Your Honor.
20             THE COURT:  You have no objections?
21             MS. DAVID:  That's correct, Your Honor.
22             THE COURT:  All right, thank you, Ms. David.
23             Yes, Mr. Arens, on behalf of -- well, not
24   really, you're not appointed yet, but I'll let you
25   speak.

1    MR. ARENS: I've been pining over that dilemma
2    all weekend, Your Honor.
3    THE COURT: What's the dilemma? Whether or
4    not you should be representing this defendant?
5    MR. ARENS: Yes.
6    THE COURT: Does he want a court-appointed
7    counsel?
8    MR. ARENS: It appears so. I've had several
9    discussions with him and --
10    THE COURT: Does he feel he's entitled to a
11    court-appointed counsel?
12    MR. ARENS: Does he know --
13    THE COURT: No. Does he feel that he is
14    entitled to receive a free lawyer?
15    MR. ARENS: Yes, Your Honor.
16    THE COURT: Okay. So, and the issue that
17    we're going to focus on now is, how do we go about
18    ascertaining his financial status to see if he
19    qualifies for a CJA attorney such as yourself.
20    MR. ARENS: It seems the first hurdle is
21    ascertaining whether he has a colorable claim in the
22    underlying criminal charge. And I'm hoping everybody
23    is in agreement that a bank fraud charge is a colorable
24    claim. We're speaking of hundreds of millions of
25    dollars, and any questioning concerning Mr. Pearlman's

1   assets could bear directly on this case.

2           And what we would suggest is, if everyone is
3   in agreement, that there is a colorable claim that we
4   go to the next step, and that is, whether it's filling
5   out a financial affidavit, and allowing the court to
6   review it in chambers or in court, and then seal it, or
7   having an adversary hearing, for lack of a better word,
8   and having it under oath.  Either way would be fine
9   with us.

10          From what I've discovered is the Ninth Circuit
11  hasn't ruled precisely on this.  They, by the same
12  token, do not seem to have rejected the extension of
13  *Simmons*, when it comes to the conflict between Fourth
14  and Fifth Amendment rights.  But this is new ground for
15  our office as well, Your Honor.  It seems that all of
16  the cases keep the documents sealed until the
17  conclusion of the criminal matter.  And that's --

18          THE COURT:  What if, I was just thinking about
19  this this weekend, what if during the course of the
20  proceeding, and maybe this is not relevant to anything,
21  but what if he goes to trial in Florida, and he
22  testifies, and he says X, and the United States
23  Attorney--because I'm a former prosecutor so I would
24  think like this probably--thinks, you know what, I
25  think that there might be -- I want access to

1　information about his financial status.　During the
2　course of that proceeding, do you think that the United
3　States Attorney in Florida would have standing to have
4　that information released?
5　　　　　　　MR. ARENS:　For impeachment purposes?
6　　　　　　　THE COURT:　For impeachment purposes.
7　　　　　　　MR. ARENS:　Yes, I think so.
8　　　　　　　THE COURT:　And during the trial, not at the
9　end of the trial.
10　　　　　　　MR. ARENS:　That's correct.　My understanding
11　of the state of *Simmons* now is that it has been
12　modified over the years to allow for use of that
13　information, in the event someone takes the stand and
14　they want to be impeached with that information.
15　That's my understanding, Your Honor.
16　　　　　　　THE COURT:　Okay.
17　　　　　　　MR. ARENS:　And we would offer as an
18　alternative to the court having to decide this, my
19　client has indicated and I've explained in depth Rule 5
20　and Rule 20 and his rights associated with this
21　proceeding and the actual process which is about to
22　take place, and he's indicated a willingness to waive
23　counsel altogether and moot the issue.
24　　　　　　　THE COURT:　Well, it's up to him.　I mean he
25　has that right.　And if he wishes to waive his right

1  to counsel, then I have to now go through a colloquy

2  of that, so we can moot this issue. If he wants to

3  proceed on his own, he may do so. He'll have to

4  come --

5            MR. ARENS: One moment, Your Honor.

6            THE COURT: Okay. So there's two options

7  here, so that he understands and you understand; if he

8  believes that he has a, quote, colorable claim as you

9  put it, end quote, to have right to counsel at

10  government expense, then we're going to proceed with an

11  *in camera* review of his financial position. If he

12  feels that he does not deserve a right to counsel, and

13  he does not qualify for right to free counsel, and he

14  wishes to represent himself, then the court will embark

15  on a colloquy for self-representation to protect the

16  record. So if you want a few minutes to talk to him,

17  you can, and then I'll wait for your decision.

18            MR. ARENS: Thank you.

19            (Pause to confer with the defendant.)

20            MR. ARENS: Thank you, Your Honor.

21  Mr. Pearlman's indicated he would feel a lot more

22  comfortable with counsel.

23            THE COURT: With counsel. All right. So he

24  feels that he -- all right.

25            So then you're asking the court in your

1    paperwork, Mr. Arens, that you wish the court to embark

2    on a closed proceeding at this time so that I may

3    obtain the required financial information.

4         MR. ARENS: You can do that, Your Honor, or

5    allow us time to fill out a financial affidavit and

6    then seal that document, that would be the court's

7    discretion. And then our further prayer for relief

8    that the court preclude its, the transcript's use,

9    obviously, from the criminal proceeding.

10        THE COURT: You don't mean the transcript; the

11   financial affidavit.

12        MR. ARENS: If it's done in an adversary

13   proceeding where my client takes the stand, we would

14   want that --

15        THE COURT: I don't think it's going to be --

16   it's not going to be an adversary proceeding. If I

17   conduct an *in camera* review, Mr. Arens, if I conduct

18   an *in camera* review, it's just me and your client and

19   Ms. Miles, that's it. I'm going to clear the courtroom

20   and I'm just going to speak to him about his financial

21   -- I'm going to ask him the specific questions

22   delineated in the financial form, and I'll even have

23   the probation officer in here, and then he can just

24   answer that directly, and if it shows that he has a

25   colorable claim which justifies a court-appointed

1  counsel, then I will come back on the record, have you

2  all present, indicate that, then we will proceed to the

3  removal proceeding.

4  MR. ARENS: Very well. The court's discretion

5  at this point. Thank you, Your Honor.

6  THE COURT: Very well. The court will ask

7  that everyone clear the courtroom at this time based

8  on the law, and then I will resume court, except for

9  the defendant, he will be here. Only the defendant,

10  Ms. Miles and myself, and the probation officer.

11  (The courtroom is now being cleared.)

12  MR. ARENS: Your Honor, something brought to

13  my attention.

14  THE COURT: Yes, Mr. Arens.

15  MR. ARENS: I don't see the necessity of

16  having probation in here.

17  THE COURT: Well, probation usually conducts

18  the financial interview with the defendant, so, she's

19  an officer of the court, the court has no problem with

20  her staying through here.

21  MR. ARENS: Okay, thank you.

22  THE COURT: Very well. I need the prosecutor

23  here, Ms. David.

24  (Ms. David returned to the courtroom.)

25  THE COURT: Yes.

1           MR. ARENS: Mr. Modaber just pointed out

2  something of significance to me, and I apologize for

3  not being more abreast of the procedures we're to

4  follow. But the court queried our office as to the

5  procedure where we talk to the client before probation.

6           We typically like to fill out financial

7  affidavits, and Mr. Modaber has explained to me that

8  the reason we do that is because having the probation

9  officer fill out the form is a waiver of Fifth

10  Amendment right. In other words, he is voluntarily

11  giving that information to probation, and therefore he

12  waives his Fifth Amendment right.

13           So, so long as the record is absolutely clear

14  that this could not be construed as a waiver of Fifth

15  Amendment right, that seems to be reasonable. But

16  otherwise, Mr. Modaber says that that is clear waiver

17  of a Fifth Amendment right to discuss finances in front

18  of probation. And precisely the reason why we employ

19  the procedure we employ at our office.

20           THE COURT: All right, your point is taken.

21           Very well, the court will clear -- have the

22  court cleared, excuse me. And then the only person

23  present is the defendant.

24                (Whereupon a sealed hearing was conducted

25                     by the court.)

1    THE COURT:  Okay, the court is back in session
2    after having conducted an *in camera* hearing with
3    Mr. Pearlman.

4    And just for the record, the court had gone
5    over every single question on this financial affidavit,
6    Mr. Arens and Ms. David, and the defendant was -- had
7    answered the questions that I had posed to him.  And
8    the court believes, based on the statements made by
9    Mr. Pearlman, that he is eligible for court- appointed
10   counsel at least at this time, and that his financial
11   status now has been properly addressed by the court,
12   and this court has a better understanding of what the
13   defendant's financial status is currently.

14   I do want to ask the FBI, is it true that the
15   FBI has seized some funds?  And if so, is that to be
16   sent for purposes of the investigation?

17   MS. DAVID:  Yes, Your Honor, the government
18   has seized some funds in connection with the
19   defendant's stay in Indonesia, and it is being sent
20   back to Orlando as part of the evidence seized.

21   THE COURT:  All right.  Based on that then,
22   the court will go ahead and allow the defendant to
23   receive counsel.  I understand it's an amount that's
24   not insubstantial, but because it's part of -- is it my
25   understanding it's part of the investigation; is that

1  correct?

2         MS. DAVID: That's correct, Your Honor.

3         THE COURT: In light of that then, the court

4  will go ahead and grant Mr. Pearlman's request for

5  court-appointed counsel, and for the limited purpose

6  of this hearing. And, Mr. Arens, you will now be

7  court-appointed counsel for the defendant.

8         MR. ARENS: Yes, Your Honor.

9         THE COURT: Now let's proceed with the

10  colloquy for the removal proceeding.

11         The United States has filed a petition for

12  writ of removal with respect to the defendant, Louis

13  Pearlman.

14         And I need to ask Mr. Kline or the United

15  States Attorney a few questions. First of all, who's

16  going to speak, is it going to be Mr. Kline or you,

17  Ms. David?

18         MS. DAVID: Actually either or, Your Honor,

19  depending on the question.

20         THE COURT: All right. The first question is,

21  for the record, where did the alleged offense -- where

22  was the alleged offense committed?

23         MS. DAVID: Your Honor, the warrant is based

24  on a criminal complaint filed in the Middle District of

25  Florida, Orlando Division. There is one count of bank

1 fraud charged in the criminal complaint, in violation

2 of Title 18 United States Code, Sections 1344 and 2.

3 THE COURT: Right. And I see that, I read

4 this affidavit by Scott Skinner, he's the FBI agent,

5 and he had submitted an affidavit for the limited

6 purpose of establishing probable cause; is that

7 correct?

8 MS. DAVID: That is correct, Your Honor.

9 THE COURT: Okay. Can you tell me when was

10 the defendant arrested? And as I understand it,

11 though, the defendant was arrested with the warrant

12 from Florida; is that correct?

13 MS. DAVID: Yes, Your Honor, he was expelled

14 after being located in Bali, Indonesia, with the

15 assistance of the Indonesian, Bali police authorities.

16 He was expelled from that country as an undesirable

17 visitor, and was escorted to Guam, the nearest U. S.

18 jurisdiction, whereupon agents from the Federal Bureau

19 of Investigation assigned in Guam executed the arrest

20 warrant.

21 THE COURT: All right. And was that on March

22 2nd, 2007, is that the right date or no?

23 MS. DAVID: No, Your Honor, he was --

24 THE COURT: That was the date the arrest

25 warrant was issued. I'm sorry. What date was he

1  arrested?

2          THE COURT:  On June 15, 2007.

3          THE COURT:  When you said he was expelled,

4  just for purposes of clarification, does that mean that

5  the government of Bali indicated that they did not wish

6  him to be in their country?

7          MS. DAVID:  That's correct, Your Honor.

8          THE COURT:  So what did they do, did they call

9  up the FBI or the U. S. Marshals?

10         MS. DAVID:  Your Honor, it's my understanding

11  that Indonesia cooperated with the Federal Bureau in

12  connection with this investigation in Florida, when it

13  was determined that the defendant was located in Bali.

14  And since there is no extradition treaty with

15  Indonesia, it's basically an agreement between the two

16  governments, with their cooperation and assistance.

17         THE COURT:  So it's just voluntary, if there's

18  no extradition treaty, then it's up to the country,

19  such as Indonesia, to decide if they voluntarily want

20  to cooperate with the United States?

21         MS. DAVID:  That's correct, Your Honor.

22         THE COURT:  And they obviously did in this

23  matter?

24         MS. DAVID:  Yes.

25         THE COURT:  Okay.  And as I understand it,

1    there's only been a complaint issued in Florida, but an

2    indictment has not been returned, or an information has

3    not been filed.

4            MS. DAVID:  That is correct, Your Honor.

5    However, I would note that under Rule 5, depending on

6    whether the issue of identity has been resolved, it's

7    the government's position that the defendant still can

8    be transferred back to the Middle District of Florida,

9    Orlando Division, based on the arrest warrant in the

10   case.

11           THE COURT:  Right.  And then there could be a

12   full identity hearing, you mean, in Florida?

13           MS. DAVID:  No, it would have to be here, Your

14   Honor.

15           THE COURT:  First here, and then he would be

16   transferred to Florida?

17           MS. DAVID:  Correct.

18           THE COURT:  All right.  Let me now get the

19   defendant up to the stand, Mr. Arens, with yourself,

20   and advise the defendant of certain rights before we

21   proceed.

22           Okay.  Mr. Pearlman, first of all, are you

23   Louis J. Pearlman?

24           THE DEFENDANT:  Yes, I am.

25           THE COURT:  And your last name is spelled

1   P-E-A-R-L-M-A-N?

2            THE DEFENDANT: Yes, it is.

3            THE COURT: What does J. stand for?

4            THE DEFENDANT: J-A-Y.

5            THE COURT: Jay, okay, that's your middle

6   name. All right. First of all, I want to advise you

7   of certain things. Number one, do you understand that

8   you are charged in the complaint issued by the United

9   States District Court, Middle District of Florida,

10  Orlando Division, with the charge of bank fraud, in

11  violation of 18 U.S. Code, 1344?

12           THE DEFENDANT: Yes.

13           THE COURT: All right. Have you had an

14  opportunity to review the criminal complaint?

15           THE DEFENDANT: Yes.

16           THE COURT: Do you understand that you are

17  charged with: On or about September 18, 2004, in Orange

18  County, in the Middle District of Florida, and

19  elsewhere, that you did knowingly execute and attempt

20  to execute a scheme and artifice to defraud Integra

21  Bank, a financial institution whose deposits were

22  insured by the Federal Deposit Insurance Corporation,

23  and knowingly execute and attempt to execute a scheme

24  and artifice to obtain moneys, funds, credits, assets,

25  and other property owned by and under the custody and

1   control of Integra Bank, a financial institution whose

2   deposits were insured by the Federal Deposit Insurance

3   Corporation, by means of false and fraudulent

4   pretenses, representations, and promises, in violation

5   of Title 18, United States Code, Section 1344 and 2.

6           THE DEFENDANT: Yes, that's the charge.

7           THE COURT: Okay. Now, do you understand that

8   this crime is punishable by a fine not to exceed one

9   million dollars and or incarceration not to exceed 30

10   years?

11           THE DEFENDANT: I understand that from you.

12           THE COURT: All right. Now you've indicated

13   you've had a chance to review this particular charge.

14   Did you have a chance to review this with Mr. Arens

15   before he was officially court appointed?

16           THE DEFENDANT: Just briefly.

17           THE COURT: All right. Do you understand the

18   charge as I've explained it to you?

19           THE DEFENDANT: Yes.

20           THE COURT: All right. Do you understand that

21   you have the right to remain silent, and that any

22   statement that you make here in open court may be used

23   against you?

24           THE DEFENDANT: Yes.

25           THE COURT: If you choose to make a statement,

1   you are free to stop at any time, do you understand

2   that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Do you also understand is that you

5   have the right to waive the removal hearing and

6   voluntarily return to the district where the charges

7   are pending?  Do you understand that?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Do you have any questions about

10  that?

11           THE DEFENDANT:  I guess I'll just talk with my

12  attorney about that.

13           THE COURT:  I'm sorry?

14           THE DEFENDANT:  I'll have to talk to Mr. Arens

15  about that, what that exactly means.

16           THE COURT:  You'll have to ask Mr. Arens what

17  that means?

18           THE DEFENDANT:  He can explain it to me, yes,

19  in detail.

20           THE COURT:  Well, we're going to discuss that

21  shortly, how we're going to proceed.

22           Do you understand that in these proceedings

23  you have a right to a preliminary hearing in this

24  district or in the district where the charges are

25  pending within 10 days pursuant to Federal Rules of

1  Criminal Procedure 5(c), 5.1, and 18 U. S. Code 3060;

2  do you understand that?

3          THE DEFENDANT: I guess so.

4          THE COURT: Do you also understand that you

5  have a right to waive a preliminary examination

6  altogether?

7          THE DEFENDANT: A prelim --

8          THE COURT: Preliminary examination?

9          MR. ARENS: May I have one moment?

10         THE COURT: Right, go ahead.

11             (Pause to confer with defendant.)

12         MR. ARENS: Your Honor, the reason my client

13  is unaware of that is that it's my understanding, and

14  I believe the government concurs, that under Rule 5,

15  my client is not entitled at this juncture to a

16  preliminary hearing on the basis that a warrant has

17  already been issued. I may be wrong, but that's my

18  understanding. And the government --

19         THE COURT: You agree with that then?

20         MS. DAVID: Yes, Your Honor, if the court is

21  satisfied with the warrant which is attached as Exhibit

22  B and the government's petition that indeed there is a

23  warrant issued in the Middle District of Florida,

24  Orlando Division and, indeed, this is the same person

25  who is wanted in the warrant, and the defendant has in

1    effect waived his identity, it's the government's
2    position a removal order can be executed.
3              THE COURT:   Just proceed to the removal order
4    then?
5              MS. DAVID:   Yes, Your Honor.
6              THE COURT:   All right.   I see this is the
7    warrant issued by Judge Glazebrook, the United States
8    Magistrate Judge in Florida?
9              MS. DAVID:   Yes, Your Honor.
10             THE COURT:   That's the one -- okay.   Let me
11   make sure I have that.   I do have that warrant for
12   arrest, I think that is him.
13             All right.   What is the -- this is Exhibit B,
14   is that correct, the one that was submitted to the
15   court?
16             MS. DAVID:   Yes, Your Honor.
17             THE COURT:   Okay.   Let me just ask.
18             So, Mr. Arens, does your client wish to
19   contest the United States request for writ of removal?
20             MR. ARENS:   No, Your Honor.
21             THE COURT:   He wishes to waive?
22             MR. ARENS:   Yes, Your Honor.
23             THE COURT:   Okay.   Mr. Pearlman, do you
24   understand that by waiving removal, you are agreeing
25   to return back to Florida and to answer to the charge

1  that -- the bank fraud charge that I've mentioned

2  earlier?

3              THE DEFENDANT:  Yes.

4              THE COURT:  All right.  If that occurs I could

5  order that you be held in custody pending your

6  transport back to Florida, do you understand that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  And once you arrive in the

9  District of Florida, the Federal District Court Judge

10  will determine your custodial status there; do you

11  understand?

12              THE DEFENDANT:  Yes.

13              THE COURT:  All right.  Now, how quickly --

14  who's going to take the defendant back, Mr. Kline, or

15  U. S. Marshals?  Who's taking the defendant back to

16  Florida?

17              MS. DAVID:  That would be the U. S. Marshal

18  Service, Your Honor.

19              THE COURT:  Okay.  Victor, how quickly is he

20  going to be able to be transported back to Florida?

21              DEPUTY MARSHAL:  Within ten days, Your Honor.

22              THE COURT:  Within ten days?  Are you all

23  starting to get the paperwork going to have him removed

24  to Florida?

25              DEPUTY MARSHAL:  Yes.

1          THE COURT:  Okay, let me look at this right

2     here.

3          Mr. Arens, is your client giving up his right

4     to contest that there is probable cause to believe a

5     crime has been committed, in this case a felony crime,

6     and that he is the person noted in the complaint as the

7     person who committed that pursuant to the criminal

8     complaint that I've just discussed?

9          MR. ARENS:  Yes, Your Honor.  In fact, I've

10    just been handed a waiver of identify form.  My client

11    executed one on Friday, but we're prepared --

12         THE COURT:  Can you speak up?  I can't hear

13    you.

14         MR. ARENS:  -- prepared to sign the waiver of

15    identity at this time, Your Honor.

16         THE COURT:  All right, go ahead and have your

17    client sign that.  And I'll get a copy of that.

18         As I understand it, your client has just

19    signed the waiver of identity.  And is there also a

20    consent for removal, or is that just an oral consent?

21         MS. DAVID:  Your Honor, my office provided a

22    warrant of removal.  I only have a copy.  I believe the

23    order is with the court.

24         THE COURT:  An order of removal, you mean?

25         MS. DAVID:  A warrant of removal.

1    THE COURT:  A warrant of removal.  So I have

2  the original here?

3         (Pause to peruse documents.)

4    THE COURT:  All right, we have that.  Let me

5  see the removal warrant and then also the identity

6  hearing -- did he just sign that?

7         All right.  Mr. Pearlman, and I understand it,

8  it indicates here that after advice of counsel, that

9  you are waiving an identity hearing and you consent to

10  an issue of an order requiring that you appear in the

11  Middle District of Florida where there's a warrant

12  outstanding for your arrest.  Is that right?

13         THE DEFENDANT:  Yes.

14         THE COURT:  I have to find that you have --

15  let me look at this for a second.

16         I just have to ask you a few questions before

17  I determine whether or not this waiver of identity is

18  freely, knowingly, and intelligently and voluntarily

19  given.

20         First of all, how old are you, Mr. Pearlman?

21         THE DEFENDANT:  53.  Tomorrow I'll be 53.

22         THE COURT:  Excuse me?

23         THE DEFENDANT:  Tomorrow I'll be 53 years old.

24         THE COURT:  Okay.  And how far have you gone

25  in school?

1        THE DEFENDANT:  College.

2        THE COURT:  And did you complete college?

3        THE DEFENDANT:  Yes.

4        THE COURT:  And did you receive any degree?

5        THE DEFENDANT:  Yes, Bachelor's of Arts.

6        THE COURT:  I'm sorry?

7        THE DEFENDANT:  Bachelor of Arts,and an MBA.

8        THE COURT:  Bachelor of Arts degree in what?

9        THE DEFENDANT:  In accounting.

10       THE COURT:  And you have an MBA, you've

11   indicated?

12       THE DEFENDANT:  Yes.

13       THE COURT:  Now, have you been treated

14   recently for any mental illness or addiction to

15   narcotic drugs of any kind?

16       THE DEFENDANT:  No.

17       THE COURT:  Are you currently under the

18   influence of any drug, medication or alcoholic beverage

19   of any kind?

20       THE DEFENDANT:  I take medication for medical

21   reasons, diabetes problem.  I have also cardiovascular

22   problem, and I have high blood pressure and high

23   cholesterol.  And I also was in hospital for a kidney

24   operation which I had a couple of years back, and I

25   have a very bad back.

1            THE COURT:  Are you currently taking

2   medication for all of those ailments?

3            THE DEFENDANT:  Yes, six different

4   medications.

5            THE COURT:  All right.  Is that influencing

6   your ability to think clearly and intelligently and

7   knowingly as it relates to this hearing?

8            THE DEFENDANT:  No.

9            THE COURT:  All right.  And are you still

10  taking your medications regularly while you're under

11  the custody of the United States marshals?

12           THE DEFENDANT:  Yes, I am.

13           THE COURT:  Very good.  Now, is your decision

14  today entirely voluntary?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Has anyone forced you, threatened

17  you, coerced you, or promised anything to get you to

18  waive your right to a removal hearing and an identity

19  hearing?

20           THE DEFENDANT:  No.

21           THE COURT:  Okay.  I find that the defendant

22  has chosen to waive both removal and an identity

23  hearing before this court, and I have also found that

24  the defendant has voluntarily agreed to return to the

25  Middle District of Florida where his charge is pending.

1    I further find that the defendant's waivers are freely,

2    knowingly, and intelligently and voluntarily made

3    without any promises, force, threats or coercion.

4        On the issue of bail, Ms. David?

5        MS. DAVID:  Your Honor, we're recommending

6    that he be detained and the marshals transport him to

7    the Middle District of Florida.

8        THE COURT:  Mr. Arens?

9        MR. ARENS:  The government, what they have

10   just said, have not met their -- has not met their

11   burden.  They've got to show either a flight risk or a

12   danger to the community.  And I would assert if given

13   an opportunity that Mr. Pearlman is neither.

14       THE COURT:  Well, he has no money.  Where is

15   he going to stay if I release him pending his

16   departure?

17       MR. ARENS:  Well, being able to come up with a

18   hundred dollars a night or $50 a night to stay at the

19   Cliff Hotel would be not as burdensome as the money it

20   would take to afford counsel.  And so, it's my thought

21   that if the court were to grant his release, he may be

22   able to borrow the money or something, at least so he

23   can stay out of jail.  And the reason for this request

24   is, I don't think anybody in this room could say that's

25   a danger to the community.

1           And he has expressed to me that he does have a

2   cardiovascular ailment, he has a bad back, he's had a

3   kidney operation, he is claustrophobic, has diabetes,

4   high blood pressure. And most significantly is the

5   conditions at the federal facility at Hagatna are such

6   that they are locked down 23 hours a day. And Mr.

7   Pearlman sleeps on nothing more than what appears to be

8   a bean bag, less -- less support than even a sleeping

9   bag. And he says he complained of pain just from

10  staying there one night. He, based on his

11  claustrophobia, he needs fresh air, he needs to get

12  out.

13          THE COURT: Well, can't you put in a request

14  to the facility, Hagatna facility, that he get fresh

15  air?

16          MR. ARENS: That request by our office has

17  been made, my recollection, several times, and we've

18  been told no, they're on lockdown, it's mass punishment

19  because of an incident which occurred a couple of

20  months ago, perhaps four months ago. And I could

21  certainly ask, but --

22          THE COURT: You mean to tell me that all the

23  defendants in pretrial detention at Hagatna lockup,

24  federal and or local, are currently under 23-hour

25  lockdown?

1  MR. ARENS: Yes, Your Honor.

2  THE COURT: I didn't know that.

3  MR. ARENS: It changed just last week.

4  THE COURT: Well, your client is saying that

5  he's under 23-hour lockdown this weekend.

6  MR. ARENS: Yes.

7  THE DEFENDANT: I was. I wasn't given any

8  fresh air. My back, I couldn't sleep because of my

9  kidney operation which I had, when I sleep on the side,

10  the bed, it's not really a bed, it's like he said, a

11  bean bag, and I can't sleep because I have pain when

12  I'm turning in the middle of the night, it's really

13  hurting my back pretty badly. And I have cardio-

14  vascular circulation problems, I have to walk and

15  exercise, otherwise -- when they checked me out, I

16  arrived with the FBI, and they could tell you I gave no

17  problems at all, the agent sitting here could tell you

18  I gave no problems.

19  THE COURT: Which agent, you mean the marshal?

20  THE DEFENDANT: No, the FBI agent sitting

21  there in the back.

22  THE COURT: In the blue shirt?

23  THE DEFENDANT: Yes. And they could tell you

24  also that I've been nothing more than a standup guy.

25  The problem is with me is I like to get some sleep and

1  I have a sore throat from sitting around there and not
2  being able to get my resistance back.

3          And, you know, I don't mind doing what I have
4  to do, but it's putting undue pressure on me that I
5  can't really -- I tried walking in the middle of the
6  night in this little room, I tried to get some
7  exercise, I can't even do that because there's another
8  fellow there.  And even if there wasn't another fellow
9  there, I asked if there was another type of bed, they
10 said no, this is it, you're lucky with what you have.
11 And it's a question of sleeping, I can't sleep without
12 some kind of support for the back.  And the other
13 problem is that I was locked down all weekend, I
14 couldn't go out more than one hour to do showering and
15 such, that's it, 23 hours a day I was locked down.

16         THE COURT:  All right.  Ms. David?

17         MS. DAVID:  Your Honor, I'm unaware of what's
18 currently in effect at this time.  I mean, that's
19 within the discretion of the U. S. Marshals and the
20 prison authorities who are managing and maintaining the
21 federal prison facility in Agana.

22         But as to his risk of flight and whether or
23 not this defendant should be released pending his
24 removal to Florida, we have for the court's review, and
25 counsel's review, the defendant's passport; in it are

1  several stamps showing his recent travels this year,

2  whether it's in Germany, whether it's in Ireland,

3  whether it's in Indonesia, whether it's in Panama.

4  It's the government's position he is a risk of flight.

5           THE COURT: Are you saying that you believe he

6  was evading authorities by traveling to these different

7  countries?

8           MS. DAVID: Well, Your Honor, it's reflected

9  in the affidavit in the complaint that the State of

10  Florida, when it had filed their case sometime back in

11  December, or around the latter part of the year, and

12  shortly after that, the defendant fled and his

13  whereabouts had been unknown until his arrest in

14  Indonesia. He now currently faces not only state

15  charges but this federal prosecution in Florida.

16           THE COURT: Are there state charges -- have

17  state charges been lodged against the defendant in

18  addition to this federal charge?

19           MS. DAVID: That is my understanding based on

20  the reading of the affidavit in support of the

21  complaint and arrest warrant.

22           THE COURT: So you're saying he's a flight

23  risk then?

24           MS. DAVID: Yes, Your Honor.

25           THE COURT: And that's just based on his

1   travel, the travel to these various countries that
2   you've indicated?
3           MS. DAVID:  As well as his means to find
4   resources to travel to those countries.  The government
5   respectfully recommends that he be detained.
6           THE COURT:  Do you know, do you have any
7   information as to whether or not the defendant went to
8   Bali because there was not an extradition treaty?  Do
9   you have any information regarding that?
10          MS. DAVID:  Not at this time, Your Honor.
11          THE COURT:  I see.
12          MR. ARENS:  Your Honor, may I be heard please?
13          THE COURT:  Just one second, she's checking.
14          MS. DAVID:  Not that I'm aware of, Your Honor.
15          I would also note for the court that in
16  connection with the arrest, some documents that were
17  found in the defendant's room were what the government
18  believes to be passport size photos.  He currently has
19  a valid passport, yet he had numerous passport size
20  photos in his room.  He also had --
21          THE COURT:  I'm sorry, can you pull up the
22  mic?  He had additional passport size photos?
23          MS. DAVID:  Yes, Your Honor.
24          THE COURT:  So that's an indication therefore?
25          MS. DAVID:  He has the means to, to travel,

1  whether it's not in the current passport he is

2  currently using, but he has the means to seek other

3  travel documents.

4          THE COURT:  You mean try to obtain other

5  passports?

6          MS. DAVID:  That is correct.

7          THE COURT:  Okay.  Anything further, Ms.

8  David?

9          MS. DAVID:  He also had in his possession

10 literature as to visas and residency in Panama.  And

11 a review of his passport reflects current travel to

12 Panama as early as February, or the early part of this

13 year.

14         THE COURT:  Okay.  And so, I'm not familiar

15 with Panama.  Does Panama, what's the deal with Panama

16 then?  There's no extradition treaty?  Is that what

17 you're saying?

18         MS. DAVID:  I'm not aware of that, Your Honor.

19         THE COURT:  You mean that there is or there's

20 not, or you're not sure, you don't know the status?

21         MS. DAVID:  I'm not sure.

22         THE COURT:  Well, you said his passport

23 reflects Germany.  What was the other?

24         MS. DAVID:  Your Honor, just --

25         THE COURT:  Indonesia?

| | |
|---|---|
| 1 | MS. DAVID: Just within this year, his |
| 2 | passport reflects travel to Indonesia, Frankfurt, |
| 3 | Berlin, Panama, Dusseldorf. |
| 4 | THE COURT: What's the other one? |
| 5 | MS. DAVID: Dusseldorf. |
| 6 | THE COURT: Is that in Germany? |
| 7 | MS. DAVID: Yes, Your Honor. |
| 8 | THE COURT: Okay. Dusseldorf. |
| 9 | MS. DAVID: Yes, Your Honor. Madrid, Munich. |
| 10 | THE COURT: This is all within the last year? |
| 11 | MS. DAVID: Yes, Your Honor. June of 2006 to |
| 12 | the present date. |
| 13 | THE COURT: Uh-huh. And therefore, because |
| 14 | he's traveled to all these places, you're saying that |
| 15 | what? |
| 16 | MS. DAVID: He has the means to travel. |
| 17 | Apparently he's able to get funding, whether it's just |
| 18 | for an X amount to stay in a hotel. He's well traveled |
| 19 | to countries outside of U. S. jurisdiction. We |
| 20 | believe. |
| 21 | THE COURT: Do you know if these countries, |
| 22 | again, because I haven't studied it myself, are these |
| 23 | countries countries that have no extradition treaties |
| 24 | with the United States? |
| 25 | MS. DAVID: No, that's not the case. Germany |

1   has an extradition treaty, as well as other parts of --

2   countries in Europe.

3           THE COURT:   What about Panama, you don't know?

4           MS. DAVID:   That's correct, Your Honor.

5           THE COURT:   How about Spain?

6           MS. DAVID:   I believe they have an extradition

7   treaty.

8           It's also my understanding, Your Honor, in the

9   hotel he was staying in in Bali, he was registered not

10  under his name but a different person's name.

11          THE COURT:   Okay.

12          MS. DAVID:   And if the court should have any

13  additional questions, we do have Mr. Smith available.

14          THE COURT:   And Mr. Smith is the man in blue?

15          MS. DAVID:   David Smith, he is the Assistant

16  Legat in Indonesia.

17          THE COURT:   And he's the gentleman in blue

18  that the defendant says he can vouch for him?

19          MS. DAVID:   Yes, Your Honor.

20          THE COURT:   All right.   Why don't you have him

21  come up to the table, because I see Mr. Arens is

22  objecting to the defendant being remanded to the

23  custody of the U. S. Marshals pending his removal.

24          Yes, Mr. Smith?   Is that your name, sir?

25          MR. SMITH:   Yes, sir -- yes, ma'am.   Excuse

1    me.

2            THE COURT:  That's all right.  I've been

3    called sir a lot.

4            MR. SMITH:  I'm sorry.

5            THE COURT:  Can you get up to the mic, please?

6    And just tell us what is your full name and what is

7    your position.

8            MR. SMITH:  My name is David C. Smith, I'm a

9    supervisory special agent, and I act as the assistant

10   legal attache for the FBI in Jakarta, Indonesia.

11           THE COURT:  Okay.  And so I guess the question

12   is, is this defendant a flight risk or a danger to the

13   community such that he should be remanded to the

14   custody of the U. S. Marshals pending his travel by our

15   U. S. Marshals to Florida?  Can you enlighten the

16   court?

17           MR. SMITH:  What I know is that based on my

18   conversations with the case agent, there's over 500

19   million dollars that is missing at this time, has

20   allegedly been defrauded from 2,000 plus investors, and

21   according to the case agent, that money is currently

22   unaccounted for.  When we arrived in Bali, Mr. Pearlman

23   was registered under a different name, A. Incognito

24   Johnson.

25           THE COURT:  That was his name?

1    MR. SMITH:  That was what his name was

2    registered at the hotel.

3    THE COURT:  I mean it said A --

4    MR. SMITH:  Incognito Johnson.

5    He did not have his passport in his

6    possession, it was at an office where the Balinese

7    police had to go down and had significant problems

8    getting that passport.  There was documents within

9    his briefcase that was a Panamanian -- attempting to

10   inquire about Panamanian residency.  And, no, I don't

11   know about extradition with Panama.

12   There was significant travel, and he had

13   basically disappeared.  There was considerable concern

14   by the case agent, by the U. S. Attorney's Office in

15   Orlando whether he would ever be seen again.  Recently

16   his home I guess was auctioned, his possessions were

17   auctioned.

18   And he had approximately $20,000 in U. S.

19   money; about $16,500 in U. S. cash, about 40 million

20   Indonesia Rupiah, which is about 4500 U. S. dollars.

21   He had in his possession a Black American

22   Express Card which is very exclusive, I think you can

23   buy a house with that.

24   THE COURT:  Really?

25   MR. SMITH:  It's very exclusive.

1           THE COURT:  Never heard of it.

2           MR. SMITH:  I've never seen one.

3           THE COURT:  I've never heard of it.  I guess

4    I don't qualify.

5               (Chuckling.)

6           MR. SMITH:  And I'm trying to think.

7           THE COURT:  And that was in his possession

8    when you arrested him?

9           MR. SMITH:  Yes.

10          THE COURT:  Is that you're saying?

11          MR. SMITH:  Yes, it was.  And Mr. Pearlman was

12   cooperative throughout, to be fair, he was cooperative

13   during the process.  I can confirm that.

14          THE COURT:  All right.  So it's your request,

15   though, Agent, or Attache Smith, that -- right?

16          MR. SMITH:  Yes.

17          THE COURT:  -- that the defendant be remanded

18   to the custody of the U. S. Marshals?

19          MR. SMITH:  Yes.

20          THE COURT:  Mr. Arens?

21          MR. ARENS:  Thank you, Your Honor.  I'm just

22   going to have to take these one at a time.  If I may,

23   may I approach to give this to the court, so I could

24   show it to the court --

25          THE COURT:  There are two different passports,

1  or the same passport?

2       Lani, do you want to give me that?

3       Will you speak into the mic, Mr. Arens,

4  because you speak so low.

5       MR. ARENS: Your Honor, the reason I'm showing

6  the court that passport is the court will notice that

7  every visa in there was issued prior to the complaint

8  filed in Florida. I show that to the court also to

9  illustrate that in years prior, Mr. Pearlman traveled

10 just as much as he did last year.

11      Your Honor, I'm somewhat embarrassed to say

12 that when I was notified of this case, I didn't know

13 who Mr. Pearlman was. I Googled the name Louis

14 Pearlman and no fewer than a thousand documents

15 popped up. I soon understood the significance of

16 Mr. Pearlman's dilemma and the reason he was in Bali.

17 He was in Bali prior to the issuance of the complaint.

18 And, Your Honor, I question the government to explain

19 why someone would go to Bali to hide at the Marriott.

20 That's not reasonable.

21      THE COURT: What about the issue of he didn't

22 use his name?

23      MR. ARENS: Mr. Pearlman explained to me that

24 in the movie and music business, in the entertainment

25 business, to avoid press -- and if the court or the

government were to Google his name, they would see the amount of press he's received over the year -- they typically put a false name so they're not bombarded by the paparrazi and the press. And he showed them his passport; there was nothing ill founded about it.

He was eating breakfast when they found him at the Marriott. That's not indicative of someone hiding from the law, particularly since he was there on vacation. And if the court peruses the passport, you'll see he's been almost everywhere in the world, China, India, countries in the Mideast, and Panama.

The Panama issue, number one, Panama, my client explains to me, they have an extradition treaty. Number two, his business brings him to every corner of the world, and Panama happened to be one of the places, and he was seeking information on visas and how long he could stay there. Incidentally, it said residency in the same booklet and the government jumps to the conclusion that he's trying to run away to a country that has an extradition treaty to hide from the government.

I would note that the bankruptcy, I think the agent tried to indicate that he has no ties in Florida; that is absolutely incorrect. He's got two involuntary bankruptcies, and he's got every reason in the world to

1    contest the forfeiture of the property that he owns.

2    He has, in my understanding, the resources that are

3    commensurate to an individual who deals in the hundreds

4    of millions of dollars a year, who travels to a

5    different country every year.

6        So my point is, is the government's taking a

7    little bit here, a little bit here, a little bit here

8    and none of it has any significance.  The State of

9    Florida does not have a pending prosecution, according

10   to my client, that case has been withdrawn.

11       His American Express, I'm not even sure --

12       THE COURT:  Withdrawn, what do you mean,

13   declined prosecution?

14       MR. ARENS:  Or dismissed.  I can't for certain

15   say what the actual characterization of it is, but my

16   client indicated that it's no longer a real case.  And

17   perhaps --

18       THE COURT:  Dismissed with prejudice or

19   without prejudice?

20       MR. ARENS:  I don't know, Your Honor.

21       THE COURT:  Okay.

22       MR. ARENS:  My client has been cooperative.

23   I wasn't certain if the agent was going to be here, and

24   prior to today's hearing I asked the agents if I could

25   represent to the court that my client's level of

1 cooperation was good, to say the least. And they said
2 yes, you may make that representation in court.

3 Your Honor, my client's got claustrophobia,
4 diabetes, high blood pressure, kidney operation, bad
5 back, cardiovascular problems, and he's not about to
6 run anywhere. The way they were able to apprehend him
7 was someone recognized him when they were eating
8 breakfast in the Marriott. He couldn't go to the
9 airport and not be recognized. He couldn't go anywhere
10 and not be recognized. Furthermore, they have his
11 passport.

12 And as for the passport visas, or the passport
13 photos, that is the means with which to evade law
14 enforcement? Mr. Pearlman, and I think any world
15 traveler would know, you typically carry passport
16 pictures with you for the purpose of applying for a
17 visa. That's not to say he's going out to get another
18 passport, Your Honor. They've got it, he could not
19 leave this island both for health reasons, for
20 financial reasons, they've got his airplane ticket.

21 All we are asking is that the court recognize
22 that bit by bit, they didn't meet their burden. He has
23 waived his identity, he has waived removal, he has been
24 cooperative with the court, cooperative with the
25 agents. He has no criminal history record, he is

1    absolutely not a danger to society.  And I would just
2    state that if the court were to look at every one of
3    the items that the government presented, the fact that
4    he traveled as frequently in years prior as he did in
5    this year that they're saying he's bouncing around the
6    world --

7            THE COURT:  Well, do you know why he traveled
8    to Bali?

9            MR. ARENS:  He traveled to Bali because he's
10   a wealthy man, and he totally explained to me he was
11   staying in the Marriott to relax.

12           THE COURT:  A wealthy man.  And he wants a
13   free lawyer?

14           (Chuckling.)

15           MR. ARENS:  He had the wherewithal to go
16   there.  He was facing tremendous pressure with the
17   bankruptcy cases and --

18           THE COURT:  He went to Bali after the criminal
19   complaint was filed in the United States District for
20   the Middle District of Florida.

21           MR. ARENS:  My recollection is that the
22   complaint was filed after he left.

23           THE COURT:  Okay.  When did he go to Bali?

24           I see this stamp, I have June 5th, 2007.

25           MR. ARENS:  The complaint is March, I believe,

1  Your Honor?  I believe.

2          THE COURT:  March, so he went after it was

3  filed.  That's what it says here.

4          MR. ARENS:  (Turning to defendant.)  Had you

5  received a copy --

6          THE COURT:  The criminal complaint was filed

7  March 2nd, 2007.  Is that right, Ms. David, or

8  Mr. Kline?

9          MS. DAVID:  Yes, Your Honor.

10          THE COURT:  And then the defendant -- this is

11  stamped -- I'm just kind of flipping through his

12  passport, it says -- stamped June 5th, 2007, right, for

13  Bali, Indonesia.

14          Why was he in Bali?  Mr. Arens, what did you

15  say, because he's wealthy?

16          MR. ARENS:  Because he's accustomed to that

17  lifestyle, Your Honor.

18          I didn't hear what the agent said about an

19  American Express Black, but I queried --

20          THE COURT:  He said you could buy a house with

21  that.

22          MR. ARENS:  I think you have to spend a

23  million dollars a year on a credit card to qualify

24  for one of those.  You don't apply, they ask you to.

25  My client was a wealthy man, he was accustomed to a

1  lifestyle of, for lack of a better word, jet setting,

2  and he was facing some tremendous pressures.

3           THE DEFENDANT:  Your Honor, I can answer some

4  of those questions.  First of all, the hotel was the

5  Westin Hotel in Bali.  Second of all, I had no idea

6  there was even an arrest warrant for me.  I knew there

7  were some issues and problems going on.

8           I do travel frequently with my bands.  To

9  answer your question is, I went in February to Ireland

10 for a big showcase that was done for Trail Line, which

11 is a charitable event, with one of my groups called

12 Streetwise.  It was on television.  I then had gone to

13 Germany with my band, US5, which is my recent, like a

14 young Back Street Boys, and I was there with them on

15 camera at the Golden Camera Awards which I was at,

16 which is a very big event there.  The band is now

17 starting to break into the Asian market.

18           Bali has always been a place that I've been

19 going up and back to over many times.  And if you check

20 the Indonesian records, you'll see that I've been to

21 Bali more than just those times you're referencing.

22 You're seeing there June 1.  Go back and you'll see

23 there's a couple of other stamps in there for Bali too.

24           But the fact of the matter is I had no idea

25 there was an arrest warrant at all until Dave Smith

1    showed it to me in Bali, and as soon as he showed it to
2    me, I was very cooperative and I went with them, took
3    them to my room, answered the questions, and that they
4    asked me to answer about my whereabouts and about going
5    back.  I certainly gave no problems at all.

6         The thing is that I do quite a bit of
7    traveling because that's the nature of our business,
8    and each of those events, we also have our bands going
9    to South America, the Back Street Boys and In Sync were
10   very big in Panama, Costa Rica, Rockin' Rio in Rio de
11   Janeiro, we've done all those major events, Mexico.  I
12   do a lot of traveling, and this is something that's
13   normal, as you can see.

14        The Black American Express Card, yes, I did
15   have it and we did spend quite a bit of money.  Since
16   my involuntary bankruptcy, which I was aware of, they
17   had cancelled my card; my card is no longer valid and
18   American Express stopped it.

19        But from my point of view is that I've always
20   been very cooperative and tried to build up my artists.
21   And from Bali, my plan was going ahead and possibly
22   going to Japan, and I needed some visas -- you need
23   photos for that too, because we're looking at having
24   US5 go to Japan in the next one or two months to expand
25   there.

1    And the Incognito issue is that whenever we

2    file -- if you ask Westin Hotel what name I checked

3    under was under Pearlman, with my passport, which they

4    asked to see, which is customary for them to do, plus

5    I was earning my frequent flier points under my real

6    name, and I got those points on my statement from

7    Starwood Hotels. So I was never trying to evade

8    anything.

9    But when I travel with my bands, you see, when

10   we travel from place to place, we get phone calls in

11   the middle of the night, people call me up and say,

12   hey, I want to speak to Nick from Back Street, in the

13   middle of the night when I'm sleeping, and I can't have

14   that, and the bands don't want to have that. So we

15   always go incognito, which we always tell the hotel

16   manager, and we have a name, a followup name. And

17   that's what we do, all of our band members do that,

18   that's normal in the industry. You're not going to

19   find Tom Cruise under his name, you're not going to

20   find Jennifer Lopez under her name, you find them under

21   incognito names, and the hotels know that. But the

22   hotel knew a hundred percent my true name, and like I

23   said, I earn my mileage points.

24        THE COURT: All right, thank you.   Thank you

25   for the clarification.

1             All right. Anything further then before I

2  make my decision here?

3             MR. ARENS: Yes, Your Honor, I'd just like to

4  -- and I feel comfortable that the court is aware of

5  this that I'm referencing, Section 3142, 18 USC,

6  paragraph (b), release: The judicial officer shall

7  order the pretrial release of a person on personal

8  recognizance or upon execution of an unsecured bond.

9  That's the first directive of the statute.

10            The second is, if the judicial officer

11  determines, as the government is urging, that release

12  is not -- will not reasonably assure the appearance of

13  the person, then the judicial officer shall order the

14  pretrial release of the person, subject to certain

15  conditions.

16            It's my thought to the court that given

17  everything Mr. Pearlman has said, given the

18  explanations for all of these little tidbits that the

19  government has come up with, that they haven't met

20  their burden. And more importantly, that there are

21  conditions; we are all in this room creative enough to

22  come up with conditions that would insure his

23  appearance. Daily people report to, or frequently

24  people self-surrender to the marshals. None of his

25  behavior is indicative of someone who is about to

1  flight. Not only is his behavior indicative of someone

2  who's extremely cooperative, he couldn't flee if he

3  wanted to, they have his passport. He would be seen at

4  the airport. He's got health concerns, lockup is not

5  the place for him. And we respectfully request that

6  the court allow him to be released under the promise to

7  return as directed by the marshals. He could call them

8  every day.

9         THE COURT: All right.

10        (Pause while counsel & defendant conferred.)

11        MR. ARENS: He just brought it to my attention

12 that people know him on Guam because this has been in

13 the *Marianas Variety*, the PDN, the TV. Mr. Rapadas

14 talked about it the other night, Friday night on TV.

15 And it's unreasonable to think he's going to slip

16 through the authorities at the airport.

17        Respectfully submitted. Thank you.

18        THE COURT: All right, thank you. And just

19 for you to know, Mr. Pearlman, in my 13 years as a

20 judge both on the federal bench and the local bench, I

21 don't think I've ever allowed a defendant who faces a

22 removal to be released to his own custody unless the

23 United States Attorney's Office has agreed to that,

24 and there are certain conditions placed on that

25 release.

1    Although the court sympathizes with all of
2 your issues regarding your medical ailments, the court
3 finds that there are no conditions that will reasonably
4 assure his appearance in Florida, and the court
5 therefore believes that the defendant does pose risk of
6 flight. The court has reviewed the extensive
7 affidavits submitted by Scott Skinner, the Federal
8 Bureau of Investigation agent, and the court believes
9 that that particular affidavit clearly delineates that
10 there's a very complex allegation that's been pursued
11 against this defendant. And the fact that the agent,
12 Mr. Smith, has indicated that there's potentially 500
13 million dollars involved in this alleged scheme, and
14 there are approximately 2,000 investors, seems to me
15 that the defendant would pose a flight risk.

16    In addition, the court finds that, as it
17 relates to some of the rebuttal arguments, if you will,
18 made by Mr. Pearlman, although they may sound
19 legitimate, I think that the United States Attorney's
20 Office and the FBI have a legitimate interest in
21 insuring that this defendant makes it to Florida, and
22 he makes it to Florida quickly.

23    So the court will remand the defendant to the
24 custody of the United States Marshal forthwith.
25    I will ask Mr. Roman, our United States

1    marshal, to see if the Agana facility could address his

2    medical concerns. You know, I don't -- I think that we

3    have a duty to insure that his health is taken care of

4    pending his removal to Florida. So can you take care

5    of that?

6              DEPUTY MARSHAL: Yes, Your Honor.

7              THE COURT: All right. Who do you talk to,

8    the DOC officials?

9              DEPUTY MARSHAL: I normally talk to the nurse,

10   in the dispensary.

11             THE COURT: Very well. And if it's true that

12   he may need to walk around, I mean, I can't tell the

13   Department of Corrections how to handle their prisoners

14   on pretrial release, but to the extent that he needs

15   assistance in getting fresh air and insuring that he

16   has a comfortable bed because of his situation --

17             Was it your kidney? Is that what you said?

18             THE DEFENDANT: Yes.

19             THE COURT: If they can accommodate in

20   insuring that his health is taken care of while he's

21   under United States federal custody. Okay, Mr. Roman,

22   you take care of that.

23             DEPUTY MARSHAL: Yes, Your Honor.

24             THE COURT: Very well. The court then will

25   remand the defendant, and he will be held and then

1 transferred to the Middle District of Florida. That

2 will be the order of the court.

3 Anything further, Ms. David, or Mr. Kline?

4 MS. DAVID: May we have his passport back,

5 Your Honor?

6 THE COURT: All right. That's it, that will

7 be the order of the court. Thank you.

8 (Proceedings concluded at 3:56 p.m.)

9 * * *

10

11 CERTIFICATE OF REPORTER

12

13 CITY OF AGANA       )
                      ) ss.
14 TERRITORY OF GUAM   )

15

16 I, Wanda M. Miles, Official Court Reporter

17 of the District Court of Guam, do hereby certify the

18 foregoing pages 1-58, inclusive, to be a true and

19 correct transcript of the shorthand notes taken by me

20 of the within-entitled proceedings, at the date and

21 time therein set forth.

22 Dated this 20th day of July, 2007.

23

24 *Wanda M. Miles*

25